IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 3:21-CR-30118-DWD |
| | ) | |
| JAYKUMAR PATEL, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes the United States of America, by Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois, and through Peter T. Reed, Assistant United States Attorney, who provides the Court with the Government's Sentencing Memorandum.

**I.   INTRODUCTION:**

In the summer of 2021, Defendant Jaykumar Patel was part of an India-based criminal conspiracy to defraud vulnerable victims across the United States and take their hard-earned money. Scammers called victims by phone and presented a fictitious story—that the victim's identity had been stolen, that a rental car in the victim's name had been recovered with drugs and blood in it, or that a victim's family member was in trouble—and demanded money to fix the problem. Victims sent hundreds of thousands of dollars in response to these scare tactics. Some of the money was mailed to Patel, who picked up victims' cash at places like FedEx and Walgreens, then dropped the cash off at other locations, all at the direction of individuals in India who

communicated with him using a texting app. The total intended loss attributable to Patel was $483,947.00. The Government now recommends a guideline range sentence of 41-51 months for Patel.

## II. SENTENCING RECOMMENDATION

The Sentencing Guidelines assign Mr. Patel an offense level of 22 after acceptance of responsibility, and a criminal history category of I. PSR ¶ 42. This is based on the following calculations:

| Basis | Offense level |
|---|---|
| Base offense level | 7 |
| Loss over $250,000 | +12 |
| 10 or more victims | +2 |
| Scheme substantially outside the US | +2 |
| Vulnerable victim | +2 |
| Acceptance of responsibility | -3 |
| **Total offense level** | **= 22** |

PSR ¶¶ 29-42. Thus, the advisory guideline range is 41-51 months' imprisonment, a fine of $15,000-$150,000, and 1-3 years' supervised release. PSR ¶¶ 79-86. The United States recommends a sentence within the Guideline range.

## III. APPLICATION OF THE 18 U.S.C. § 3553 SENTENCING FACTORS

### A. Nature and Circumstances of the Offense.

On a Monday morning in June 2021, "E.R.'s" phone began to ring. E.R.—an elderly resident of Alton, Illinois on a fixed income—picked up the phone. The male on the other end of the line identified himself as "Weston" and claimed that he was a law enforcement officer. Weston had bad news: E.R.'s identity had been stolen by

unscrupulous thieves. Weston and others were working to protect her, but they needed help. He instructed E.R. to send $30,000.00 in cash via FedEx to an address in St. Petersburg, Florida, near where Patel lived. E.R. followed Weston's instructions. She went to the bank, pulled the cash from her account, and lied to the teller about the reason for the withdrawal. She placed the money (later determined to be $29,000.00) between the pages of a magazine, lined the package with aluminum foil, and sent it by FedEx to "Chris White" in St. Petersburg, Florida as instructed. Eight days later, Defendant Patel turned up to claim the package addressed to "Chris White." He was arrested at the scene.

Nothing "Weston" told E.R. was true. Her identity had not been stolen and no legitimate member of law enforcement would ever demand money from victims.

But that did not stop "Weston," Patel, and others from swindling E.R. out of virtually every dollar she had, $79,413.00 dollars in all. Two days after sending the first package and again at Weston's instruction, E.R. withdrew $40,000.00 more from her bank, went to a local gas station in Alton, and placed the money in the trunk of a "detective's" vehicle. A review of Defendant Patel's phone turned up directions from the airport to Alton around this time, although it does not appear that he personally picked up the money. E.R. later reported that she found this second request suspicious, so she had her boyfriend talk to Weston too, and her boyfriend agreed that Weston seemed legit. On June 24, E.R. went to the bank a third time, withdrew the remaining money in her account, retained some to pay a few bills, then sent $9,413.00 to a hotel address in Omaha, Nebraska.

E.R.'s life savings, it turns out, was only the tip of the iceberg for this group. In just eight days (June 21-June 29), Patel was instructed to retrieve packages containing approximately $390,561.00 from at least fifteen discrete victims. PSR ¶¶ 19-20. The total intended loss jumps to about **$483,947.00** when relevant conduct is added in. *Id.* ¶ 21. Even that amount includes only money the criminal conspiracy routed through Patel. For example, only $29,000 of E.R.'s money went through Patel, even though her total loss was about $79,000. Similarly, only $20,000 of victim S.S.'s money went through Patel, even though S.S. had a total loss of $130,000.00. In sum, Patel played a part in an extraordinarily lucrative and widespread criminal machine.

The identified victims fall in a class of particularly vulnerable victims. They are overwhelming elderly, with several in their 80s and 90s. PSR ¶ 19. Such individuals are particularly vulnerable to fraud crimes like these. Elderly victims are also typically on fixed incomes, as victims E.R. and M.K. report they were. PSR at 6-7. These vulnerabilities are reflected in the guideline range and should also be considered as part of the nature of the offense under Section 3553(a).

Patel may argue that he had no direct contact with the victims and so did not know where the money was coming from. He is not entitled to stick his head in the sand and claim ignorance about what he was doing. First, no one sends tens of thousands of dollars in cash bills by FedEx for legitimate purposes. He knew it was a criminal conspiracy and acknowledged as much in his guilty plea. Second, he knew the scheme was orchestrated from outside the U.S. He was recruited while in India and acted at the direction of coconspirators there. Third, he knew the scheme targeted

4

individuals all over the U.S. The packages often had the victims' name and return address on them, and even when they did not, the victim's information was often provided to Patel by text message. So he knew there were many senders, that those senders were located all over the country, and that they were not communicating with him directly. In a word, he knew they were victims and that there were many of them. Fourth, the contents of the packages gave Patel many clues about the mental states of the senders. E.R.'s money was tucked into the pages of an old magazine and calendar, which were themselves wrapped in duct tape, and then wrapped in aluminum foil. S.S's money was hidden in copies of Good Housekeeping, Elle Décor, and Instant Pot Recipes. Another package had a shoe box with a tennis shoe inside, an old sock stuffed inside the shoe, and $14,500 cash inside the sock. This was not the work of sophisticated parties, and anyone who had opened several such packages (as Patel had) knew that.

Finally, Patel's actions caused significant harm to his victims.[1] The scheme worked by scaring victims into compliance. M.K., age 66, described being "shocked and terrified" that the scammers knew so much about M.K.'s daughter and handicapped son. Scammers even sent M.K. the name of a Texas attorney allegedly involved in the case against her. Victim H.C., age 78, was told he would be arrested if he didn't mail in the money. Victim S.E., age 68, was told a car tied to her name had been stopped at the border with signs of drug trafficking and blood. Scammers told her

---

[1] Three victims so far have submitted formal victim impact statements for purposes of sentencing. The experiences of others victims are reflected in various police reports filed in their home jurisdictions.

5

that she would be watched "everywhere" she went until she paid up. She too feared arrest.

His crimes also hurt his victims financially. Multiple victims describe losing their life savings. Victim S.E., who cried throughout her interview with police, disclosed that she had sent the last of her money and had to rely on her children financially. Victim S.S. said, "My financial well being was destroyed. I still haven't recovered and probably never will." Many victims reported being on fixed incomes.

Patel's crimes have also caused ongoing medical and psychological harm. E.R. reports that the crime "affected my health," raised her blood pressure, affected her sleep and self-respect, and left her "stressed out." S.E. reports being prescribed medication for depression, noting the ordeal had "set my life upside down." M.K. explained: "I now live with constant fear when the phone rings and I don't know who is calling. I feel unsafe even with the authorities as they were unable to protect me. For months after I found it difficult to leave the house . . . even now I find myself scared, vulnerable, insecure in my discussions with a sense [of] impending doom." M.K. concluded "I have strongly desired to receive counseling help [but] am unable to afford it."

In sum, Patel's offense is at the upper end of the guideline bracket by dollar amount, it preyed on some of the most vulnerable, and it made a devastating impact on his victims. The court should consider these facts under Section 3553(a).

### B. History and Characteristics of the Defendant.

Defendant's history and characteristics also favor the recommended sentence.

This was not a crime driven by need or even by drug use. Patel reports that he

obtained his M.B.A. in 2012. PSR ¶ 67. He reports an ownership interest valued at $250,000 in an Indian company. PSR ¶¶ 69, 75. He reports significant cash on hand, real estate, and personal property holdings exceeding $270,000. He also received monthly unemployment checks from the United Kingdom, likely during or near the time he committed his criminal offenses. PSR ¶ 70. This was about greed and making a quick buck.

Patel may claim that he did not derive all that much financial benefit from his crimes. To start, the severity of the sentence should be measured by the loss he was willing to impose on others, even if it turns out that his crimes followed a poor business plan. And factually, any such claim by Patel would just be wrong. Patel claims he was paid 1% of what he picked up. PSR at 4. That is about $3,900 for one week of work from June 21 to June 29—a pretty good return. *Id*. at 5. Moreover, there is some reason to doubt Patel's claims about his cut of the profits because he first began getting money from the conspiracy in May, 2021, *before* Patel claims to have picked up any packages on its behalf. PSR at 5. Finally, a close accounting of the money picked up and dropped off by Patel suggests he had about $29,000.00 in cash on hand when he was arrested— that is, cash Patel had picked up but not dropped off yet. PSR at 9. To date, Patel has not produced this money, which belongs to the victims in this case.

These facts reflect on defendant's character. Despite having significant assets on hand, Patel engaged in a scheme to take from others. To date, he has not returned the money he took or paid restitution, although he *has* indicated he plans to do so prior to sentencing. *See* Doc. 44. Any steps Patel voluntarily takes (or does not take) to make

7

things right should be taken into account by the Court inasmuch it reflects Patel's character, circumstances, and acceptance of responsibility. *See* U.S.S.G. 3E1.1 note 1 (noting "voluntary payment of restitution prior to adjudication of guilt" among the factors used to measure acceptance of responsibility).

### C. Post-indictment conduct.

Patel's post-indictment conduct also bears on the history and characteristics of the defendant. *United States v. Kuczora*, 910 F.3d 904, 907, 909 (7th Cir. 2018) (taking post-indictment conduct into account under Secion 3553(a) factors). Again, at the time of his arrest on June 29, 2021, Patel had approximately $29,000.00 in victim cash on hand. PSR at 9. This money was not recovered. Patel was indicted on August 3, 2021.

A few days later, on August 12, 2021, Patel's spouse purchased a new 2021 Mustang for $54,995.00 and put $12,000.00 cash down on the vehicle. *Id*. Patel denies that the Mustang was purchased using the proceeds from the fraud scam. Even if Patel's denial is an honest one, the Court should consider that they chose to spend the $12,000.00 on a new Mustang *within weeks* of an indictment charging that Patel's actions had caused significant financial harm to elderly victims across the country.

A week later, on August 18, 2021, a victim in Pennslyvania was instructed by a scammer to send a package containing $9,999.00 overnight via FedEx. Earlier packages had been sent to neutral locations, like Walgreens or FedEx stores. But this time the scammer directed that the package be sent to a residential address—Patel's apartment. That same day (August 18), Patel had told an apartment complex employee that he was expecting a FedEx package, and asked that the package be delivered directly to him and

not to his spouse. Law enforcement in Pennsylvania acted quickly, recovering the package before it reached Patel. Patel later denied all knowledge of the package. But it is unlikely that the scammers would intentionally direct cash to Patel unless they believed Patel was still in on it. Its also hard to see how it was a mistake, since routing victim's packages directly to Patel's home address was a change in tactics.

These facts too reflect on Patel's character, showing that even after his indictment he still did not appreciate the seriousness of his crime or the harm he had caused.

### D. Deterrrence.

Section 3553(a)(2)(B) states that a district court must consider, among other things, the need for the sentence "to afford adequate deterrence to criminal conduct." In this Circuit, considering general deterrence at sentencing has been lauded as "a means of preventing like or related crimes." *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014). It is an "important goal of sentencing." *United States v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015).

Two factors justify increased consideration of general deterrence in this case. First, effective deterrence of financially profitable crimes requires punishment that makes the criminal conduct not worth it. These type of telemarketing fraud schemes involve large amounts of money and are difficult to effectively punish because the money and key players often quickly move overseas. This increases the need for deterrence. "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both

9

attributes go to increase the expected benefits of a crime and hence the punishment required to deter it." *See United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994).

Second, white-collar offenders are more responsive to deterrence. White-collar criminals are "'prime candidates for general deterrence'" because they "'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (citation omitted; emphasis added); *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) ("general deterrence is particularly important in the context of white collar crime").

The court should sentence Patel in a way that deters others from similar conduct and protects potential future victims.

### E. Restitution.

Restitution is required. A portion of the restitution amount was recovered by law enforcement. The PSR determined that Patel still owes restitution in the total amount of $ 136,800.00. PSR ¶ 88. Patel has indicated his intention to pay this amount prior to sentencing.

## IV. CONCLUSION

For the foregoing reasons, the United States asks the Court to impose a sentence within the guideline range, which is 41-51 months' imprisonment.

    Respectfully submitted,

    UNITED STATES OF AMERICA,

    RACHELLE AUD CROWE
    United States Attorney

    s/ *Peter T. Reed*
    Assistant United States Attorney
    Nine Executive Drive
    Fairview Heights, Illinois 62208
    (618) 628-3700 telephone
    (618) 628-3720 facsimile
    E-mail: Peter.Reed@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2022, I caused to be electronically filed the foregoing Government's Sentencing Memorandum to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

    */s/ Peter T. Reed*
    PETER T. REED
    Assistant United States Attorney